The next case for argument is Vasto v. Credico, LLC. Hold on just a second, Mr. Jaso. It's Hasso, Your Honor. Hasso, excuse me, I apologize. Not at all. Mr. Hasso, good morning. Good morning, Your Honors, and may it please the Court. My name is Eric Hasso of the law firm of Spiro Harrison. With me here is Jason Perez, my colleague. I've reserved two minutes for rebuttal. Yes. Your Honors, we believe that the plaintiff's workers here and the putative class that they represent are exactly the kind of workers doing exactly the kind of job that the wage and hour laws were intended to protect. These plaintiffs worked 12-hour days, six days a week, standing on street corners, essentially collecting leads for potential free cell phone customers that were part of a federal government program. They started each day with a rally of sorts at the office and ended the day with what's called a bell and gong ceremony, which was, we allege, a cult-like public praise and shame ritual where the workers' daily proceeds and results were reviewed. These workers received no base salary or benefits. They received $10 in purported and labeled as such commission, not for every person that they collected information on but for every approved customer. That is, that the information that they collected on the street went to a third party that determined whether the person was eligible under the federal program to receive a free cell phone. Your Honor, this quite candidly translated to third world sweatshop pay from roughly 50 cents an hour to up to $6 an hour, and this is in New York City. These workers stand in contrast to commission professional salespeople, for example, pharmaceutical company detailing representatives who have significant control over their schedules, the way that they approach customers, how they talk to customers, how they cultivate customers, where they get customers, and so forth. Here, in contrast, workers had little control over how long they worked, where they worked, how they worked, and the rules under which they worked were set by Credico. Can I just ask you to address the flood case? How is the situation here different from the salespeople for Just Energy in the flood case? It's an important case from the last year. How is it different? It is, Your Honor, and the difference is that the level of supervision, the nature of what they were doing, there, indeed, there is certain parallels, which we concede, such as the fact that you're collecting information about potential customers and that those customers have to be approved, but the nature of the workers here, as I said, was such that they were so tightly controlled by rules that were set by Credico, which purportedly is the contractor, not the subcontractor for which they directly worked, and Credico The rules are different from the Just Energy people. They had to wear particular badges. They had a script. Like you said, the deals weren't accepted until somebody else approved them. How do we distinguish flood? Well, again, Your Honor, the distinction here is in the narrow scope of where these people were allowed to work, for example. One important point Didn't a van drop the people off in a particular neighborhood at the beginning of the day and pick them up later at night? How is that different? Well, it isn't different in the logistics of it, but in the substance of what the workers could do, it was significant. For example, these workers were prohibited from going door to door and prohibited by Credico from going door to door. It's also important to note who imposed the rules and who enforced the rules. This Court has said many times, consistent with Supreme Court precedent, that the power to hire and fire is crucial in determining the status of workers and whether they're covered by the federal laws. Here, clearly Credico had the power to fire and did exercise the power to fire people, for example, for going door to door. A normal salesman, although might be dropped off on a street corner, wouldn't be prohibited, and I think that that's a distinction between the flood case. Once you're dropped on the street corner, you could have some discretion as to where you're going to go. Here, it was very circumscribed. It was basically kind of setting up a table on a street corner, and that's where they worked. So furthermore, we believe that the district court erred in looking at the facts, some undisputed and some, or I should say some stipulated, of course, but that stipulations, I think you're going to hear a lot about stipulations from my learned colleague, but stipulations, I hasten to add, do not mean the absence of a disputed material fact. There are many, many stipulations in this case, but nonetheless there are significant material facts that remain and are inappropriate for disposition at this stage. Indeed, this Court has said many times that these cases, both with regard to the control aspects of functional and actual control by the purported joint employer and the status of the worker as an exempt salesperson are highly factual analyses, which are usually, and we contest in this case, inappropriate for disposition at a summary judgment phase. I'd like to focus first on the joint employer aspect of this. As I noted, Credico exercised a tremendous amount of control over the plaintiffs. One must view this, of course, as the circumstances of the entire activity viewed in the light of the economic reality. We contest that the economic reality here, Your Honor, is that Credico essentially was perpetrating a pyramid scheme, whereby these purported ISOs, which stand for independent sales offices, were nothing of the sort, not independent, were not selling anything, which I'll get to, and were really people who were recruited up through the ranks of people who participated in this as initially workers, and then were, like the defendant, Sue, here, was recruited by an agent of Credico, who was able to and did convince her to open up Cromex. And this is how the Credico operation operates, is that they — Plaintiffs here, just so I'm sure that I'm clear on this, Mr. Hasel, were all employees of Cromex, right? Yes, Your Honor. Yes. We allege a joint employee theory. I understand the joint piece, but I'm just — they weren't in any way — there isn't a paper trail, if you will, that shows them to be direct employees of Credico. They're not direct employees of Credico. We concede that. But, again, if you look at some of the indicia of control, shifting to that topic, you can see that Credico was very involved, deeply involved in both the logistics and the rules regarding hiring or what they call onboarding individuals. As I mentioned, there are rules that if they were broken, were enforced by Credico. They were also rules that Credico, as I said, set up these independent ISOs. Those ISOs, in turn, for example, sent significant amounts of information both at the hiring process about the individual workers who were onboarded and, in fact — and this is important — on a daily basis. I mentioned the bell and gong ceremonies. The information that came back to the ISOs from Credico was sales information that was transmitted by the tablets that these individuals had. Again, the tablets themselves were property of Credico and owned and controlled by Credico, and they could be cut off by Credico. That information about the information that was collected from potential customers on the street was transmitted to Credico, and then reports were generated called feet-on-the-street reports, which went back at the end of the day, and that's how the managers then decided whether a worker would get a bell or a gong in front of his or her colleagues. Thank you, Mr. Hasley. You've reserved two minutes for rebuttal. Yes, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. My name is Jason Schwartz with the Gibson Dunn Law Firm, and I'm here with my partners Greta Williams and Mary Beth Maloney. I'd like to start, Judge Stroni, where you were, which is the flood case. I think the flood case and also the Supreme Court's decision in Encino are directly controlling here on the question of the outside sales exemption, which is dispositive of the entire case. So let me address that first, and then I'll address the joint employment. With respect to outside sales, the Supreme Court in Encino has instructed that we're no longer to look at the exemptions in a narrow way in accordance with the broader remedial purpose of the statute, but rather they mean what they say. The outside sales exemption in the statute, Section 13A.1, says that outside salespeople are exempt as defined and delimited by the Secretary of Labor. So it's a broad grant of authority. The Secretary, in turn, has defined the outside sales exemption to have two and only two criteria. Importantly, those criteria have nothing to do with pay. In fact, there is no minimum pay for an outside salesperson. Their criteria are as follows. Number one, that the primary duty is either sales or obtaining orders for services. And number two, that that primary duty be performed customarily and regularly outside of a regular place of business. If I could, Your Honor, Your Honors, let me just read you what I think is the dispositive sentence in the plaintiff's brief, which reflects the undisputed material facts below and stipulations below. Page 33 of the opening brief, quote, the economic reality is that appellants were selling phone subscriptions on the street. The first part of that sentence is the first factor. They were selling phone subscriptions. That was their primary duty. The second part of that sentence is dispositive on the second factor. On the street, they performed it customarily and regularly away from their employer's place of business. Period, full stop. That is the end of the outside sales exemption. All of the rest of what you heard about does not go to the definition that has, as this Court put it in Flood, the force and effect of law. Flood then deals with a job that is remarkably similar to this one. The only distinction I think I heard my colleague point to was that in Flood, the salesperson traveled door-to-door, like Willie Loman, if you will. Here, our salespeople travel down the block. The reason they don't travel door-to-door has nothing to do with the outside sales to statutory or to regulatory factors. But in any event, the reason is because the federal lifeline regulations, as interpreted by Sprint, the ultimate customer, prohibit that. You have to go in a place where it is available to people who may qualify. So they do it on the street. Flood did talk about supervision, Your Honor. The compliance improvement plan, 2720 of the appendix you're familiar with, of course. I am, Your Honor. It's pretty extensive about what they're supposed to wear, what they're supposed to say, points to get on probation, points to be terminated. There's at least ten bullet points. That seems like supervision to me. Why am I wrong about that? You're not wrong to an extent, Your Honor. First of all, what I would say is that is an extra statutory factor that, as Flood explained, only goes to an analytically distinct question, and that is whether your primary duty is sales or something else. That's not a question here. The primary duty clearly is sales. But even if you consider it like the court did in Flood, in Flood it was, as you pointed out, Judge Droney, exactly the same. Uniform, script, supervision, all of that here is exactly the same. And the cases are repeated in many that we've cited, including Jean-Louis, Jacobson, and others, Grodowski, where additional requirements either as a result of quality assurance or regulatory compliance, and here we've got both, right? The requirements roll down from the contract with the customer, Sprint, and from the federal lifeline regulations, quality assurance and compliance with regulations. Those do not turn the job into a non-exempt job. It's also a little bit of apples and oranges. That really goes mostly to the joint employment question, not to this outside sales question. But Flood is directly on point, answers the exact same question in virtually identical circumstances, Your Honor, and finds that the individuals are outside salespeople. So I think there's really no debate about that. And with this Court's decision in Flood and the Supreme Court's decision in Encino, there's really no room for any other outcome on that question. What would be needed here in order for it to be determined that they were joint employees, if you will? Sure. So moving then to the joint employment question. So the exemption, the outside sales, I think is dispositive for the entire case. You don't even have to get to joint employment. Right. If you did get to joint employment, what's notable here is the key factors, the Carter factors, clearly weigh heavily in our favor. The reply brief from the appellants doesn't even mention the Carter factors, literally not a word about the Carter factors. In addition to the Carter factors, this Court was clear in Zhang that there are additional functional control factors that ought to be looked at for the totality of the circumstances. Here, the District Court did a very thorough analysis of both the Carter factors and the Zhang functional control factors, finds that many of them point in our favor, meaning there's no joint employment, we don't stand in relation of an employer and employee. Others are inconclusive, and a couple point in favor of the employment relationship, but not sufficient to defeat summary judgment, as this Court pointed out in Zhang. The only thing I've heard from my colleague about why the District Court was wrong is that the tablet somehow affects this situation. So let me address that, but I want to step back for just a second to the whole relation. These people did not know a single person at Credico. They had no contact with Credico. They were hired by Cromex. They never visited Credico's office. They didn't even know where it was. They were assigned to their work locations by Cromex. And by the way, it wasn't that specific of a work location, right? All Credico did was assign Cromex a territory consistent with its contract with Sprint, because other people have different territories. Within that territory, a wide segment of New York City, then Cromex is the one who assigned them their work locations. But even there, Exhibit 91 in the trial record that we discussed at that hearing, and is in the appellate record as well, shows the assignment was like Staten Island, Coney Island, or a street name. It's not a specific address. There's lots of room to go around. So there's no control over the day-to-day working conditions by Credico. And then the best that the appellants can do is they say, well, Credico gave them the tablet, the iPad. Your Honors, I'd venture to say probably some, if not all, of you have an iPad. It does not control the way you perform your job. In this case, it's even less than that, right? It's a form. It's like we gave them a, you know, an old-time form with carbon paper in between it. And the reason there needs to be a form is because this is a federally regulated program where people have to qualify in order to get the virtual federal voucher to buy the phone and the phone service. So you fill out this form. It happens to be on the tablet. My colleague is right. It goes to a third party who has to approve it, not because they're exercising any discretion over the sale. The sale is made. They just have to confirm that the federal regulations are satisfied, that this person qualifies for the virtual voucher to purchase the phone service. So Solix, this is all stipulated in the record, Solix, the third party, looks at the information that came from that electronic form and says, yes, they qualify. Or, no, they don't because the income's too high or because there's already a cell phone assigned to that household. That's it. The sale is made on the street. They're not promoting sales for somebody else. They're not, you know, doing groundwork, collecting a list of prospects or leads, as I heard my friend say. They are making the sale. There is no other person who makes the sale transaction after they touch the customer. It's a contingent sale, though, right? It is, just like it was in flood. And, in fact, in flood, Your Honor, there was more contingency because the company, as an exercise of business judgment, could reject the sale, and the court said that's fine. Here, it's even easier. The stipulated facts provide, consistent with federal regulations, Sprint has to accept the customer if they meet the federal regulatory criteria. There's no discretion. They can't say we don't want that customer. So that tablet provided by Credico, that carbon paper form, if you will, does nothing to create a joint employment relationship between Credico and the employees of Cromex. The stipulated facts further provide, Your Honor, that the tablet itself is provided on consignment, meaning that Cromex is responsible financially, you know, if it crashes on the ground or what have you. So it's not even really providing the equipment. Contrast that with all the cases cited by the appellants with equipment and premises, right? A sewing machine that contains the pattern that dictates the work, a hospital where you're working on their premises, sharing their equipment, and Zhang, by the way, uses the term sharing, or the Rutherford case where this all comes from, where you're working in the meat plant under their supervision, using their equipment. This is nothing like that. Thank you, Your Honors. Thank you. Thank you, Mr. Schwartz. Mr. Hazel. Briefly, Your Honors, while that's interesting, if the sale is made on the street, the moment that the worker collects the information and off it goes to the third party via the tablet, they're not getting paid for that. They're getting paid only if the sale is approved. But we contend that it is, apart from language that may be in the brief, that it's not the evidence in the record. The evidence in the record is that, for example, Thomas Smith, the one I mentioned who got Defendant Hsu into this business and had a title with Credico and therefore was an agent, we allege, of Credico, told Plaintiff Vasto that, quote, we don't sell anything and that there are no sales skills in what we do. We have a 30-second spiel that anyone can do. That's in sum and substance what he said. That stands in contrast to FLUDD where the plaintiff specifically admitted that he used his skill to make sales. That's a significant distinction to add to the ones that I mentioned before, Your Honors. Lastly, the tablet. The tablet, we contend, is not simply a tablet like any one of us might use, which is adjunct to our office, our profession. They cannot, and counsel has just conceded, that they cannot, the workers cannot do anything without the tablet being activated. And Credico had and used the power for workers that they either believed correctly or incorrectly had violated some rule, like going door to door or not being in the specific place that they were assigned, they would turn the tablet off. That worker cannot send a fax. There is no carbon paper. There is no form to fill out and send any other way. That, Your Honors, we contend is their virtual office. So the idea that, A, they're conducting sales is highly questionable. Certainly there are differences of material facts, and it is by no means conceded that they are conducting sales. And secondly, we would contend that there is a significant difference of material fact, whether they are in sum and substance, outside of an office, because the moment that tablet gets cut off, there is no workplace. Thank you, Mr. Anderson. Thank you both. Thank you both. Thank you, Your Honors. Reserved decision. The last case on for argument today is Vosto. No. We are done. Right. Sorry. The last case is on submission. I apologize. United States v. Sadler and Brown is on submission, so I will ask the clerk please to adjourn court. The court is adjourned.